## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **ESTATE OF WILLIAM J. BING, ET AL.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Case No. 03-CV-510** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **CITY OF WHITEHALL OHIO, ET AL.,** | : | |
| | : | **Magistrate Norah McCann King** |
| **Defendant.** | : | |

## OPINION AND ORDER

## I.  INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment. Plaintiffs, estate administrator Thomas E. Bing and William Bing's brother, Brian Bing, have sued the City of Whitehall, the City of Whitehall's Police Department ("WPD"), the Special Weapons and Tactics ("SWAT") Team and Crisis Negotiation Unit, Officer Mark Showalter, Detective Randy Snider, Sergeant Alan, Officer Spencer Salyers, Sergeant Trent Martin, Sergeant Kent Brandeberry, Hostage Negotiator Johnny Forbes, Officer Rex Adkins, Detective Johnny Grebb, and John and Jane Doe Police Officers and Police Personnel 1-10.  Plaintiffs' First Amended Complaint alleges warrantless entry, excessive force, deadly force, and destruction of property pursuant to 42 U.S.C. §§ 1983, 1986, and 1988.  Plaintiffs also allege that the City of Whitehall failed to train adequately and supervise its agents.  Finally, Plaintiffs, under Ohio state law, assert claims of wrongful death, consortium, survivorship, and spoliation of evidence.

Defendants' Motion for Summary Judgment as to Plaintiffs' 42 U.S.C. § 1986 claims and municipal liability claims is **GRANTED**.  Similarly, the Court finds that Brian Bing's wrongful death claims cannot stand in light of Ohio Revised Code § 2125.02(A)(1).  Defendants' Motion for Summary Judgment with regard to Plaintiffs' remaining claims is **DENIED**.

## II.  FACTS and BACKGROUND

Early in the day on October 14, 2002, William Bing, who is now deceased, called Richard Finton, his former work supervisor, friend, and Alcoholics Anonymous sponsor.  He told Mr. Finton that he had recently lost his job, had broken up with his girlfriend, and was on a drinking and huffing binge.  Neighbors recalled that, throughout the afternoon and early evening, neighborhood teenagers had been taunting Bing.

Later that day, around 6:30 p.m., the Whitehall Police Department responded to a call from neighbors that some teenagers in the 600 block of Elaine Road were taunting a man and that a gun had been fired into the air.[1]  Detective Grebb and Officer Salyers were on routine patrol that night and headed to Elaine Road.  When they arrived, the teenagers reported that the shot was fired by Bing, who lived down the street, and pointed the police toward Bing's house.

The officers proceeded to Bing's house to investigate the incident.  Plaintiffs characterize Officer Salyers' intentions, at this point, were merely to conduct an interview into the alleged behavior.[2]  Shortly, other officers arrived and constructed a perimeter around the house.  In the

_____

[1]Defendants argue that Bing fired *at* the teenagers, not merely into the air.

[2]Defendants contend that when they arrived at Bing's house, Bing's neighbors, who were standing outside of Bing's home, informed them that Bing had recently fired a shot outside of his home, into the air and had appeared intoxicated.  Defendants also contend that Officer Salyers, at some point, checked the history of Bing's residence.  Officer Salyers testified: "We were advised that we had been there in the past, that he had fired shots in the past, and that other callers had

-2-

meantime, Officer Saylers attempted to make contact with Bing by yelling at him through the kitchen window for approximately twenty-five minutes and asking him, repeatedly, to come out of his house and talk.  This tactic, however, was to no avail.  Bing refused to leave his house.

The SWAT team, led by Sergeant Martin, arrived around 8:30 p.m. and participated in the blockade.  Plaintiffs assert that the police were aware that Bing was alone in the house, i.e., there was no hostage.  At 8:43 p.m., the police "threw" a throw-phone into the house.[3]  Officer Forbes periodically rang the throw-phone throughout the evening, but never made contact with Bing.  At some point after the throw-phone was deployed, Sergeant Martin attempted to breach the front door so that the SWAT team could better ascertain Bing's location inside of the house.  When the SWAT team moved toward the front door to breach it, they noticed a bullet hole in its center. The SWAT team removed the screen door entirely and used a battering ram to break down the front door.[4]  The police officers did not physically enter at this point; instead, they set up certain tools to allow them to see Bing's location more easily.

At 8:54 p.m., the first round of pepper gas was fired in through the house's front windows.  The force of the pepper spray gun was such that it shattered the front windows.  At

---

been there in the past."  Asked how it affected his feelings about going to the residence, Officer Salyers stated: "It makes you more aware . . . It tells us that there are definitely weapons in the house and that he has used them in the past."  (Salyers Dep. at 58-59).

[3]A throw-phone is a portable phone with a very long cord.  It is often used by hostage negotiators to establish contact with the perpetrator.  Additionally, a throw-phone has a one-way microphone that allows the police to hear what is going on inside the house.

[4]This information about the front door actually comes from Defendants' facts. For some reason, Plaintiffs omitted it from their fact section, even though they later referred to it in their memoranda contra.

9:50 p.m., the police fired another round of gas through the house's back windows, shattering those, too.  Plaintiffs allege that the police, in total, fired eighteen rounds of pepper gas.

Between 9:30 p.m. and 10:00 p.m., Mr. Finton arrived and asked the police if he might try and talk to Bing.[5]  The police agreed to allow Mr. Finton to use one of the cruiser's speakers. Mr. Finton testified, however, that he was not sure whether it was working properly. Mr. Finton yelled, "Hey Bill, it's your friend Richard.  Let's talk," but was specifically coached by the police to abstain from referencing Bing's family or drinking.  (Finton Dep. at 56-59).  Mr. Finton also told the police, when asked, that Bing was unlikely to pass out because Mr. Finton had known him to be able to ingest a large amount of substances and remain awake.  At some point, Mr. Finton and the neighbors had conversations about the fact that the police had not contacted any family members, noting that this decision was troublesome.

At 10:48 p.m., the police pulled the throw phone out of the front of the house and, at 11:05, threw it into the back of the house.  Shortly thereafter, Sergeant Brandeberry decided to deploy a flashbang device.[6]  Detective Grebb threw the flashbang into Bing's bedroom through a window.  According to Detective Grebb's testimony, which is contested by Plaintiffs, Detective Grebb made eye contact with Bing, who then appeared to stand up and mumble something, moved out of Detective Grebb's view, and then fired a shot in Detective Grebb's direction.

---

[5]Apparently, the police did not contact Mr. Finton.  He arrived on the scene because someone else informed him of the situation.

[6]A flashbang is a "non-lethal" device that produces a very loud noise, in excess of 180 decibels.  It is designed to distract and disorient people.  In addition to the noise, it produces over a million candle power of light.  Like a grenade, the officer pulls a safety pin out and holds the lever, which is spring-loaded and activates the fuse in approximately 1.5 seconds.  (Grebb Dep. at 26-27).

Plaintiffs stress that this "shot" at Detective Grebb is only alleged, noting that the window frame, which contains only a nick from the bullet, does not reveal whether the shot came from inside or outside the house.

At 11:20 p.m., Sergeant Martin, decided that the SWAT team should enter the house. Officer Dickey, who was holding a shield, led the SWAT team through the south-facing door, and Sergeant Martin, armed with a shotgun, followed.  Officers Salyers and Adkins, both of who held handguns, entered next.  Plaintiffs allege that, at this point, Detective Grebb threw a second flashbang into the southeast window of Bing's home.[7]  Plaintiffs note that they do not know what transpired inside the house between Bing and the SWAT team, and are left with only a smattering of facts,[8] including Mr. Finton's testimony that he saw four shots fired inside the house and the forensic report stating that a bullet from Sergeant Martin's gun severed Bing's spine and killed him.[9]  Almost immediately after the SWAT team entered, a fire, caused by the second flashbang, engulfed the home.  At approximately 11:30 p.m., the Fire Department arrived, but the police precluded the firemen from entering the home for several minutes.  The fire damage was so severe that the house was eventually leveled.  At some point following the

---

[7]Defendants contend that Detective Grebb only threw the second flashbang *after* he heard the gunshots, and that he did so with the purpose of distracting Bing from firing any more shots at the SWAT team.

[8]According to Defendants' version of the facts, when the SWAT team entered the house, they saw Bing look out of the bedroom into the hall.  Bing then stuck the muzzle of a gun through a jagged man-made hole that was approximately 4.5 or 5 feet up from the ground.  Bing fired two shots.  Sergeant Martin fired two shots at the center of the door that Bing was behind. Officer Salyers fired an additional three shots at the center of the door.

[9]The following post-mortem observations are similarly undisputed: (1) Bing sustained twenty-two shotgun wounds, although many were multiple wounds from the same bullets; (2) Bing had nine closely positioned wounds in the upper left back; (3) Bing's fibula and tibia of his left leg were broken; and (4) when Bing died, his blood alcohol level was .24%.

shooting, the Columbus Police Department investigated the death.  The case was presented to a grand jury, but no officer was indicted.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  The non-moving party then must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The Court also must interpret all reasonable inferences in the non-movant's favor.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see Reeves v. Sanderson Plumbing Products., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing the evidence).  The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient, however; there must be evidence from which the jury reasonably could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986);

*Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV.  ANALYSIS

The Court first addresses issues of qualified immunity, looking at each of Plaintiffs' Fourth Amendment claims made pursuant to 42 U.S.C. § 1983:[10] warrantless entry; deadly force; excessive force; and destruction of property.  Then, the Court addresses Plaintiffs' municipal liability claims, state law claims, and Defendants' arguments that some of Plaintiffs' claims are time-barred.

### A.  Qualified Immunity

As a threshold matter, this Court must determine whether the police officers in this case are protected by qualified immunity.  According to the doctrine of qualified immunity, "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity involves the following three-step inquiry:

---

[10]Section 1983 reads:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .
42 U.S.C. § 1983.

> *First*, we determine whether, based upon the applicable law, the facts viewed in
> the light most favorable to the plaintiffs show that a constitutional violation has
> occurred. *Second,* we consider whether the violation involved a clearly
> established constitutional right of which a reasonable person would have known.
> *Third,* we determine whether the plaintiff has offered sufficient evidence to
> indicate that what the official allegedly did was objectively unreasonable in light
> of the clearly established constitutional rights. *Feathers v. Aey,* 319 F.3d 843, 848
> (6th Cir. 2003) (emphasis added) (quotation omitted). If the answer to all three
> questions is "yes," qualified immunity is not proper.

*Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 901 (6th Cir. 2004).

The last prong, which requires the Court to determine "whether the plaintiff offered

sufficient evidence to indicate that what the [government] official allegedly did was objectively

unreasonable in light of the clearly established constitutional rights," has been interpreted to

mean that "summary judgment is inappropriate where there are contentious factual disputes over

the reasonableness of the use of deadly force." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903

(6th Cir. 1998). The court explained:

> When the legal question . . . is completely dependent upon which view of the
> facts is accepted by the jury, the District Court cannot grant a defendant police
> officer immunity from a deadly force claim. This is because the reasonableness of
> the use of force is the linchpin of the case. If the jury determines the officer shot
> the suspect without a reasonable belief that he posed a significant threat of death
> or serious physical injury to the officer or others, then the officer's actions were
> legally unreasonable under the Fourth Amendment. On the other hand, if the jury
> believes the officer's version of the facts and finds the officer's conduct was
> reasonable, then he will be entitled to qualified immunity. Where, as here, the
> legal question of qualified immunity turns upon which version of the facts one
> accepts, the jury, not the judge, must determine liability. This is especially true
> considering that the District Court must view the facts in the light most favorable
> to the plaintiff on a motion for summary judgment.

*Sova*, 142 F.3d at 903 (internal citations omitted); *see also Sample v. Bailey*, 337 F. Supp. 2d

1012, 1021 (N.D. Ohio 2004) (citing *Sova* for the above proposition and finding summary

judgment inappropriate because "whether [the police officer's actions] were reasonable is

contingent on the fact-finder's resolution of [the relevant] factual conflict.")

Against this backdrop, the Court denies summary judgment with regard to Defendants' qualified immunity defense as applied to Plaintiffs' Fourth Amendment claims. As in *Sova* and *Sample*, factual conflicts, which are the "linchpins" of the determination of the reasonableness of the police officers' actions, exist; thus, summary judgment is inappropriate.

### 1. Warrantless Entry

Plaintiffs argue that Defendants twice violated Bing's right to be free from warrantless entries: (1) when the police broke down the door and shattered his windows without a search warrant; and (2) when the police entered Bing's house after he allegedly fired in Detective Grebb's direction.

A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994). Warrantless entry is permissible, however, if exigent circumstances exist. *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992). Exigent circumstances exist where there are "real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick,* 287 F.3d 492, 501 (6th Cir. 2002) (citing *O'Brien*, 23 F.3d at 997). An inquiry into whether exigent circumstances exist looks only to "the moment the police entered the residence." *Id*. at 504. The following situations may give rise to exigent circumstances: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; and (4) a risk of danger to the police or others." *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (citing *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir. 1994)); *see also Minnesota v. Olson,* 495 U.S. 91, 100 (1990). Although

consideration of the constitutionality of the warrantless entry is pressing, the crucial question is whether the police were reasonably justified in believing that exigent circumstances existed to justify the two warrantless entries.

Defendants assert that the officers are entitled to qualified immunity because the undisputed facts show that reasonable officers in their position would have concluded exigent circumstances existed. Defendants argue that, as the night unfolded, a variety of factors conflated to make them reasonably believe that immediate danger was present, such that obtaining a warrant was not possible, including Bing having shot at or around a group of youths, Bing's refusal to surrender to police, the police officers' knowledge that they had been called to Bing's house on prior occasions because he was firing shots, Bing's intoxication, the close proximity of Bing's neighbors, and the shooting in Detective Grebb's direction.

Plaintiffs counter that no exigent circumstances existed because Bing retreated into his house, posing no threat to anyone for several hours. It was not until the police provoked him with a flashbang that he reacted violently by allegedly shooting at Detective Grebb. Even after the alleged shot at Detective Grebb, Plaintiffs argue that no exigent circumstances arose, noting that approximately thirty minutes separated that alleged shot and the SWAT team's entry into the house, thus belying any claim of immediate danger.

### a. First Set of Warrantless Entries

The reasonableness of the first group of warrantless entries, when Defendants knocked down Bing's door and began breaking his windows with pepper spray canisters, turns on whether the police reasonably believed exigent circumstances existed to justify those entries. Stated differently, did Bing present such an immediate danger that there was not time to obtain a

warrant?  This inquiry is dependent on what the officers knew about the degree of danger Bing posed.  Three factors require denial of summary judgment.  First, Defendants support their claim that Bing was a violent individual by emphasizing the fact that he fired a shot at the juveniles.  The individual officers, however, do not agree on that point.  The two first-responding police officers, Detective Grebb and Officer Salyers, recount different versions of events.  Officer Salyers' deposition does not contain any indication that the shot was fired *at* the juveniles, but Detective Grebb, on the other hand, testified that the juveniles reported they had been shot *at* by Bing.  Second, in Sergeant Martin's testimony, he implied that exigent circumstances did not exist until Bing had fired at Detective Grebb, noting that until that point, Bing posed "no immediate threat" to the community:

> Q:    Did you talk to Sergeant Brandeberry at all about why you couldn't have just outwaited him, maybe sat there all night?
>
> A:    We would have done that had he not shot through the wall at the officers.
>
> * * * * *
>
> A:    As I explained, had he not been creating an immediate threat to the people of the neighborhood and outside of the house, he could have stayed in there all night. Once he started shooting, it changed the circumstances; and we reacted to what he did.

(Martin Dep. at 154-55).   This testimony leads this Court to believe that a jury could find the officers did not reasonably believe exigent circumstances existed when Bing retreated into his house such that they did not have time to obtain a warrant.  *Cf. O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997-98 (6th Cir. 1994) ("The undisputed facts show that from the time O'Brien retreated into the house until just before the third probe, O'Brien had taken no action against the officers.  While a reasonable fact finder might infer that the officers felt threatened, there is no

-11-

evidence establishing that the threat of danger was 'immediate.'").  Third, the call regarding a shooting at Elaine Road occurred at approximately 6:30 p.m., and the police appeared to have used a battering ram to break down the door somewhere between 8:30 p.m. (when the throw phone was put into the house) and 8:54 p.m. (when the first round of pepper spray was dispersed), which leaves a two-hour gap during which it appears the police could have obtained either an arrest warrant or a search warrant.  The Court is not clear why the police opted not to do so.

In light of the above disputed facts, the jury must resolve the issue of whether the officers reasonably believed that exigent circumstances existed such that a warrantless entry was reasonably necessary.  *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) ("Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.").

### b.  Second Warrantless Entry

Similarly, the Court finds summary judgment inappropriate with regard to the second warrantless entry, which occurred after Bing allegedly shot in Detective Grebb's direction.  The crucial question is whether Bing actually shot at Detective Grebb.  If so, the police were justified in entering the residence.  The only evidence of this shooting, however, is Detective Grebb's testimony and a nick in the window frame that reveals little about the bullet's origins or its trajectory.  In fact, the gun allegedly used to fire in Detective Grebb's direction apparently contains none of Bing's fingerprints.[11]  Finally, Plaintiffs, in light of Bing's death, do not have

---

[11]The Court finds Defendant's explanation of this gun's whereabouts questionable.  At oral argument, the Court asked defense counsel whether any of Bing's fingerprints were on the gun found next to Bing's corpse.  Defense counsel first explained that the gun was recovered by

-12-

any way to rebut Detective Grebb's testimony.  See *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.

1994) (explaining that where the suspect has been killed, "the court may not simply accept what

may be a self-serving account by the police officer").  The jury can best determine the officers'

credibility regarding the direction of the alleged shot at Detective Grebb.  Thus, the Court

**DENIES** Defendant's Motion for Summary Judgment on Plaintiffs' warrantless entry claims.

### 2.  Deadly Force

A law enforcement officer has the legal right to use deadly force if the officer has

reasonable cause to believe that the suspect poses an immediate threat to the safety of the officer

or others, and that deadly force is needed to avoid that threat. *Tennessee v. Garner,* 471 U.S. 1,

11 (1985); *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 902-03 (6th Cir. 1998).  In determining

whether an officer's use of deadly force was objectively reasonable, the Court is to consider the

totality of the circumstances, including the severity of the crime at issue, whether the suspect

posed an immediate threat to the safety of the officers or others, and whether he has actively

resisted arrest or attempted to evade arrest by flight. *Graham v. Connor,* 490 U.S. 386, 396

(1989).  Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight."

*Id.*

When assessing the reasonableness of deadly force, the only relevant time period is that

immediately surrounding the SWAT team's entrance into Bing's home.  The circumstances

---

the fire chief, but then noted that some controversy ensued between the police and fire
departments regarding with which agency the gun should remain.  Although the Court will not
address the issue sua sponte, it does seem that Plaintiffs may have had a viable spoliation claim
with regard to the gun.

leading up to the confrontation are not relevant to the determination of whether use of deadly

force was constitutionally reasonable or whether the police will have qualified immunity. *See*

*Estate of Sowards v. City of Trenton*, No. 03-2036, 2005 WL 434577, at *5 (6th Cir. Feb. 24,

2005) ("The court analyzes an excessive force claim by dividing the facts into temporal

segments.");  *see also Claybrook v. Birchwell*, 274 F.3d 1098, 1104 (6th Cir. 2001) ("The

segmenting rules . . . divide[ ] the analysis of the use of deadly force from the analysis of

possible erroneous actions taken by the officers prior to shots being fired.") (internal quotation

marks omitted).

The Defendants contend that their use of deadly force was objectively reasonable because

Sergeant Martin fired his shotgun at Bing only *after* Bing had twice shot in Sergeant Martin's

direction by placing the muzzle of his gun through a hole in the door.[12]  Moreover, Sergeant

Martin knew Bing was intoxicated and had discharged his gun around juveniles.  Thus,

Defendants contend that Sergeant Martin had probable cause to believe that Bing posed a threat

of serious physical harm to Sergeant Martin and the SWAT team.[13]

Plaintiffs counter that several questions regarding the reasonableness of Defendants' use

of deadly force remain unanswered.  First, the gun allegedly used to shoot at the SWAT team did

---

[12]Defendants assert that when the SWAT team entered the house, Bing stuck the muzzle of his gun through a jagged hole in the door that was approximately 4.5 or 5 feet up from the ground.

[13]Defendants also argue that all other officers should be dismissed because the coroner concluded that Bing died of a "shot gun wound to the back," and only Sergeant Martin used the type of shotgun that caused Bing's death.  The coroner also definitively concluded that Bing did not die from burns; thus, Detective Grebb, who threw the fire-causing flashbang, should similarly be dismissed from any allegation of deadly force. The Court rejects these arguments because they turn on the jury's resolution of factual disparities.

-14-

not contain Bing's fingerprints.[14]  Second, Plaintiffs submitted an expert opinion stating that the autopsy was inconsistent with the SWAT team's version of the story to the extent that Bing's position at death was not possible in light of the police officer's version of the facts.  *See* Report of Larry M. Dehus, Forensic Scientist ("It is perfectly clear that Mr. Bing was shot in the back by one of the shotgun blasts from Sergeant Trent Martin's shotgun.  It is also equally clear that Mr. Bing could not have been shot in the manner as described by Sgt. Trent Martin and Officer Spencer Salyers.  If Bing had been shot through the bedroom door as described by Martin and Salyers, it would be impossible for his body to end up in the position as shown in the diagram and on the photographs").[15]  Along these lines, Plaintiffs disagree with Defendants' contention that Bing's broken left leg resulted from the gunshot.[16]

Finally, Plaintiffs, in light of Bing's death, do not have an alternate version of what transpired between Bing and the SWAT team.  The Court in *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) explained that where the suspect has died, the police officers' stories must be judged under a heightened scrutiny of sorts:

> Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness.  Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story--the person shot dead--is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other

---

[14]*See supra* note 11.

[15]Defendants counter that Firefighter Ronald Casto testified that he moved Bing's body in the course of extinguishing the fire.

[16]Mr. Dehus also noted that "the autopsy report does not indicate whether or not the injury associated with [the] broken leg was determined as being ante-mortem or post-mortem."

-15-

> known facts.  In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

*Id*. at 915 (internal citations omitted).  The Court finds this reasoning persuasive.  In light of both the lack of physical evidence supporting Defendants' version of events and the experts' dispute over the position of Bing's corpse, the Court concludes that the jury should be provided the opportunity to evaluate the police officers' credibility.  Thus, the Court **DENIES** Defendant's motion for summary judgment on the deadly force claim.

### 3.  Excessive Use of Force

The same *Graham v. Connor* standard applicable in the deadly force claims also governs whether Defendants engaged in excessive force.  In determining whether an officer's use of excessive force was objectively reasonable, the Court is to consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] actively resisted arrest or attempted to evade arrest by flight. *Graham v. Connor,* 490 U.S. 386, 396 (1989).

Plaintiffs claim that the use of two flashbangs and eighteen rounds of pepper spray constituted unreasonably excessive force, in violation of Bing's Fourth Amendment rights.  Plaintiffs further argue that throwing a highly flammable flashbang constituted unreasonable force in light of Defendant's knowledge that Bing was intoxicated, distraught, and had been huffing flammable liquids, which were likely still present in the air, thereby increasing the

chance of a fire.[17]  Plaintiffs also allege that the officers knew, based on conversations with

Mr. Finton, that Bing had been huffing earlier in the day.

Defendants counter that these claims have no merit.  The pepper spray and initial

flashbang were attempts to *avoid* using lethal force.  Second, even if the bedroom contained high

levels of accelerants, a contention Defendants debate, no evidence exists that the police were

aware of them.  (Grebb Dep. at 80-82) (noting that he did not smell any combustible fuels).

Finally, Defendants vehemently disagree with Plaintiffs' argument that the use of flashbangs

and/or pepper-spray has been ruled inappropriate in many cases if mentally disturbed or

intoxicated persons are present.  Defendants argue that the reasonableness of non-lethal

instruments is determined on a case-by-case basis.

Like the other § 1983 claims sub judice, the reasonableness of pepper spray and

flashbangs is a fact-heavy analysis.  Although pepper spray is not typically considered to be

excessive force, the question turns on the particular circumstances of each case.  *See, e.g.,*

*Gaddis v. Redford Township*, 364 F.3d 763, 774 (6th Cir. 2004) (use of pepper spray was not

excessive force where suspect was armed with a knife and refused to submit to arrest; noting

"[o]ne of the main purposes of nonlethal, temporarily incapacitating devices such as pepper

spray is to give police effective options short of lethal force that can be used to take custody of

an armed suspect who refuses to be lawfully arrested or detained."); *Ewolski v. City of*

*Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002) (expressing doubt "that the use of non-lethal force

against an armed and volatile suspect constitutes excessive force"); *cf. Kaylor v. Rankin*, 356 F.

---

[17]Plaintiffs note that Fire Chief Tilton testified that the fire investigators found a high
level of accelerants remained in the house after the incident.  Defendants disagree with
Plaintiffs' interpretation of Fire Chief Tilton's testimony.

Supp. 2d 839, 852 n.7 (N.D. Ohio 2005) (finding use of pepper spray may have constituted excessive force in violation of the Fourth Amendment because suspect was unarmed and not perceived as dangerous).

Similarly, use of a flashbang device is not per se unreasonable; rather, the inquiry is fact specific. *Compare United States v. Myers*, 106 F.3d 936, 940 (10th Cir.1997) ("The use of a 'flashbang' device in a house where innocent and unsuspecting children sleep gives us great pause."), *with United States v. Dawkins*, No. 01-6151, 2003 WL 22905305, at *3 (6th Cir. Nov. 24, 2003) ("Under the circumstances of the present case, we find the officers' use of the flash-bang diversionary device to be objectively reasonable. The officers knew both that the suspect possessed an assault rifle and that he had previously been convicted of a crime of violence.").

Under the *Graham v. Connor* analysis, the totality of the circumstances must be considered; however, many of the underlying facts that would determine whether the officers' use of force was reasonable are in dispute, including the severity of the initial incident, i.e., whether Bing fired a shot into the air or at the juveniles, whether Detective Grebb knew or should have known that accelerants were present and would likely start a fire, and whether Detective Grebb threw the second flashbang as an offensive or defensive measure. Because "the reasonableness of the use of force is the linchpin of the case" and "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998). Thus, Defendant's Motion for Summary Judgment on Plaintiffs' excessive force claim is **DENIED**.

-18-

### 4.  Destruction of Property

The standard for a destruction of property claim made pursuant to § 1983 falls under the same "objectively reasonable" Fourth Amendment rubric.  The destruction of property must be reasonably necessary to the performance of the law enforcement officer's duties; otherwise, such destruction constitutes an unreasonable seizure under the Fourth Amendment.  *In Newsome v. Erwin*, 137 F. Supp. 2d 934, (S.D. Ohio 2000), the plaintiff alleged that a shooting of his pet lioness constituted destruction of property under the Fourth Amendment because it was an unreasonable seizure.  The court found this argument persuasive and denied the defendants' motion to dismiss, stating "[c]onstrued most strongly in Newsome's favor, the foregoing facts suggest that Erwin personally directed and ordered the needless shooting of the lioness, in violation of the Fourth Amendment."  *Id*. at 944.  Plaintiffs argue that the officers unreasonably destroyed property by throwing a flashbang in an accelerant-filled environment and by insisting that the firefighters wait several minutes before entering the house to extinguish the fire.  Defendants counter that deploying the fire-causing flashbang was reasonable because Detective Grebb needed to distract Bing from shooting at the SWAT team.  Furthermore, Detective Grebb testified that he was not aware of a heightened level of accelerants.  Defendants concede that they advised the firefighters to wait several minutes before extinguishing the fire, but explain that, at that time, they did not know whether Bing still posed a danger.  According to Defendants, they waited until they were sure "that if somebody was going to come out of the house, they would have already done so." (Def. Mot. Summ. Judg. at 19).

The jury is best able to determine whether the destruction of property was reasonably necessary to the performance of the law enforcement officers' duties, and it will have an

opportunity to hear testimony about when, exactly, Detective Grebb threw the flashbang and what he knew about its fire-causing potential. Likewise, the jurors can assess Defendants' assertion that Bing posed a danger after the house had caught on fire. Thus, Defendant's Motion for Summary Judgment with regard to the destruction of property claim is **DENIED**.

### B. Municipal Liability

A municipality cannot be held liable under § 1983 for an injury solely inflicted by its employees or agents. *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir. 2000). A municipal government may be held liable under § 1983 if a plaintiff can establish that a government policy or custom was the cause of the alleged unconstitutional conduct. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). There must be a causal link between the alleged unconstitutional policy or custom and the specific constitutional violation alleged to have occurred. *Estate of Sowards v. City of Trenton*, No. 03-2036, 2005 WL 434577, at *10 (6th Cir. Feb. 24, 2005) (citing *Garner v. Memphis Police Dep't.*, 8 F.3d 358, 364 (6th Cir. 1993)); *see generally City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.") (footnotes omitted).

In *Canton*, the Supreme Court indicated at least two types of situations that would be grounds for deliberate indifference in the failure to train police officers.

-20-

> One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction. For example, the Court indicated that lack of instruction in the use of firearms or in the use of deadly force could constitute "deliberate indifference." *Id.* at 390.  A second type of situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers.

*Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (citing *City of Canton*, 489 U.S. at 390).

Plaintiffs in the case sub judice are essentially alleging that the WPD has a policy or custom of deliberate indifference to the rights of persons with whom the police come into contact.  *City of Canton*, 489 U.S. at 388.  Plaintiffs assert that this deliberate indifference manifests itself in WPD's "acquiescence in the unlawful use of deadly force by the police department," arguing that this policy is evidenced by the police department's subsequent "acceptance" or "ratification" of the incident. (Pl. Resp. at 33) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989)).  Plaintiffs contend that not only were the officers never admonished for Bing's death, but they were actually praised for their actions.  A letter was placed in each officer's file stating, "Everybody did a great job."  *See* Ex. 6.  Plaintiffs assert that, at the very least, there is a genuine issue of material fact as to whether the City of Whitehall ratified the actions of the police officers.

Defendants counter that the City of Whitehall and the WPD have long been committed to training their officers to act and react properly, a goal reflected in the WPD's clean record. Defendants note that both the SWAT team and the police department receive extensive training, the WPD is nationally accredited, and the WPD is required to undergo firearms requalification every year.  Defendants also reject Plaintiffs' "ratification" theory, noting that the case cited is inapposite.  In *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989), the court found extensive evidence that the sheriff failed to take any action to correct the mistreatment of

-21-

disabled inmates, thereby "ratifying" the prison employees' actions.  In that case, there were a multitude of complaints against the prison officials who violated the inmates constitutional rights.  *See Leach*, 891 F.2d at 1248 ("The Sheriff's failure to supervise and correct the situation in view of the numerous similar incidents and his failure to punish subsequently the responsible individuals is more than sufficient evidence of a policy or custom to render the County liable for Leach's damages in this official capacity suit.").  Defendants argue that the police officers' actions here were not ratified.  Rather, their actions were both subjected to an investigation by the Columbus Police Department and presented to a grand jury.

The Court finds Defendants' argument persuasive.  Plaintiffs have presented no evidence beyond mere allegation that the City of Whitehall has a policy or custom of deliberate indifference for the public's rights or a policy or custom allowing for unlawful entry or use of deadly force.  Moreover, it is convincing that the WPD has an unblemished record.  In sum, there is no genuine issue of material fact as to whether the WPD has a custom of deliberate indifference or a policy to "acquiesce" to the use of excessive force.  The Court **GRANTS** Defendants' Motion for Summary Judgment with regard to the Plaintiffs' municipal liability claim.

### C.  Section 1986 Claims

Plaintiffs' complaint alleges that, pursuant to 42 U.S.C. § 1986,[18] certain Defendants

could have prevented the police officers' conspiracy to commit harms, but failed to do so.[19]  42

U.S.C. § 1986.[20]  To effectuate a cause of action under § 1986, a plaintiff must state a cause of

action under § 1985.[21]  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 (6th Cir. 2005)

("But '[w]here plaintiff has stated no cause of action under § 1985, no cause of action exists

under § 1986.'") (quoting *Braley v. City of Pontiac*, 906 F.2d 220, 227 (6th Cir. 1990)).  In this

case, even if the Court construes the complaint liberally, Plaintiffs have not alleged a violation of

42 U.S.C. § 1985.  With regard to § 1985, the Supreme Court has stated that"[t]he language

requiring intent to deprive of equal protection, or equal privileges and immunities, means there

_____

[18]Section 1986 reads:
Every person who, having knowledge that any of the wrongs conspired to be
done, and mentioned in section 1985 of this title, are about to be committed, and
having power to prevent or aid in preventing the commission of the same,
neglects or refuses so to do, if such wrongful act be committed, shall be liable to
the party injured, or his legal representatives, for all damages caused by such
wrongful act, which such person by reasonable diligence could have prevented . .
. .
42 U.S.C. § 1986.

[19]The complaint references Section 1986 only once, alleging as follows: "Said acts by
Defendant Police Officers constitute violations of Plaintiff's rights guaranteed by the Fourth and
Fourteenth Amendments . . . , and 42 U.S.C. 1983, 1986, and 1988."  *First Amended Complaint*
at ¶ 20.

[20]Neither Plaintiffs' complaint nor their responsive memoranda address the allegation any
further.

[21] Section 1985(3), in pertinent part, reads: "If two or more persons . . . conspire . . . for
the purpose of depriving . . . any person or class of persons of the equal protection of the laws . .
. the party so injured or deprived may have an action for the recovery of damages occasioned by
such injury or deprivation, against any one or more of the conspirators."  42 U.S.C. § 1985(3).

must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971). Plaintiffs have adduced no evidence demonstrating that the events at Bing's home were motivated by racial or other class-based animus. *Radvansky*, 395 F.3d at 315 (6th Cir. 2005) (upholding dismissal of Section 1985 claims "[b]ecause Radvansky has not demonstrated . . . invidiously discriminatory animus"). Thus, because Plaintiffs failed to allege a claim pursuant to 42 U.S.C. § 1985, Defendants' Motion for Summary Judgment with regard to Plaintiffs' claims made pursuant to 42 U.S.C. § 1986 is **GRANTED**.

### D.  State Law Claims

#### 1.  Survivorship, Wrongful Death, Loss of Consortium

Defendants assert that an officer is justified in shooting as a matter of self-defense where there is reasonable cause to believe that the officer's life or safety is in danger. *Fields v. Dailey*, 587 N.E 2d 400, 406 (Ohio Ct. App. 1990) (holding that self defense is available to a police officer in defending a civil suit). Defendants argue that Sergeant Martin and his fellow team members reasonably believed that their lives were in danger when Bing began firing at them, and thus acted in self-defense. Because the outcome of the state law claims turn, in large part, on the

-24-

same facts that will be presented with regard to the remaining federal claims,[22] Defendants'

request for summary judgment on these state law claims in **DENIED**.

Additionally, Defendants argue that under Ohio Revised Code 2125.02(A)(1), only the

estate's administrator, Thomas Bing, can bring wrongful death claims.  Defendants argument is

well-taken. The statute reads:

> [A] civil action for wrongful death shall be brought in the name of the personal
> representative of the decedent for the exclusive benefit of the surviving spouse, the
> children, and the parents of the decedent, all of whom are rebuttably presumed to have
> suffered damages by reason of the wrongful death, and for the exclusive benefit of the
> other next of kin of the decedent.

OHIO REV. CODE § 2125.02; *see also Ramsey v. Neiman*, 634 N.E.2d 211, 214 (Ohio 1994) ("A

cause of action in wrongful death arising under R.C. Chapter 2125 must be brought in the name

of a person appointed by a court to be the administrator, executor, or personal representative of

the decedent's estate.").

In the case sub judice, Thomas Bing, and not Brian Bing, was appointed administrator of

William J. Bing's estate.  *See First Amended Complaint* (stating that Brian Bing brings suit

through Administrator Thomas Bing).  Thus, pursuant to Section 2125.02, Brian Bing's

wrongful death claims are dismissed.

---

[22]For purposes of this summary judgment motion, the Court assumes that it has
supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a), which reads:
> [I] n any civil action of which the district courts have original jurisdiction, the
> district courts shall have supplemental jurisdiction over all other claims that are
> so related to claims in the action within such original jurisdiction that they form
> part of the same case or controversy under Article III of the United States
> Constitution . . . ."
*Id*.  The parties have not yet briefed this issue.

28 U.S.C. § 1367(a).

## 2.  Spoliation of the Evidence

Plaintiffs argue that "Defendants acted with conscious disregard, reckless indifference and/or malice in not preserving physical evidence that was critical, material, and highly relevant, namely, the door through which Mr. Bing was shot." *See First Amended Complaint* at ¶ 34.  The door at issue is the bedroom door, which allegedly contained a hole approximately 4.5 or 5 feet off the ground that, according to Defendants, Bing stuck his gun through to fire at the SWAT team.  Plaintiffs concede that part of the bedroom door was destroyed in the fire, but contend that a substantial portion remained, emphasizing Fire Chief Timothy Tilton's testimony:  "I felt that most of the door was right there."  (Tilton Dep. at 31-33).  Plaintiffs argue that this door was crucial to their case because it could have illuminated several key issues, including the actual existence of this alleged hole through which Bing placed his gun, when the shots transpired, and who did (or did not) fire through the door.

Defendants disagree, noting that Firefighter Casto, who was the first person to encounter the door after the fire, testified that he "felt a door burned halfway off."  (Casto Dep. at 13).  Defendants acknowledge that the non-burned portion of the door is missing, but argue that this fact does not, in any way, make them liable for spoliation of evidence because Plaintiffs have presented no evidence of willful destruction.

The five elements of spoliation, i.e., the interference or destruction of evidence are as follows: (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of defendant that litigation exists or is probable; (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and, (5) damages

proximately caused by the defendant's acts.[23]  *Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037, 1038 (Ohio 1993).  A later case clarified that the third element, willfulness, contemplates not only an intentional commission of the act, but also a wrongful commission of the act.  *Drawl v. Cornicelli*, 706 N.E.2d 849, 852 (1997); *cf. White v. Ford Motor Co.*, 755 N.E.2d 954, 957 (Ohio Ct. App. 2001) ("[T]he Supreme Court was asked whether a cause of action existed for either intentional or negligent spoliation of evidence, and found only a cause of action for intentional spoliation of evidence.").

The Court finds that a genuine issue of material fact remains as to whether Defendants perpetrated the willful spoliation of evidence.  Other evidence was retained in the investigation for ballistic purposes, including the nicked window frame and the front door.  Yet, the bedroom door, which is potentially the most informative piece of physical evidence, was misplaced.  *See* Report of Larry Dehus (Forensic Scientist) ("One of the most critical pieces of evidence in reconstructing this shooting would have been the door to the bedroom where the deceased was found.  While the upper portion of this door may have sustained some fire damage, it is apparent that at least the lower half of the door would have remained intact.  This examiner is completely baffled why the officers made the effort to remove the storm door from the front door and the window frame from the northeast bedroom, yet neglected to recover the remains of the door to the north central bedroom.").  Additionally, there is contradictory testimony regarding how much of the door remained post-fire.  Thus, summary judgment of Plaintiffs' spoliation claim is **DENIED**.

---

[23]With regard to the fifth element, the Ohio Supreme Court held, in the same case, that a spoliation claim may be brought at the same time as the primary action.  *Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037, 1038 (Ohio 1993).

### E.  Statute of Limitations

Defendant's allege that certain claims made in Plaintiffs' First Amended Complaint were time-barred by the two year statute of limitations applicable to 42 U.S.C. § 1983 claims. *Browning v. Pendleton*, 869 F.2d 989, 991 (6th Cir. 1989) (explaining that Ohio's two year statute of limitations for bodily injury applies to section 1983 claims).  Here, the alleged incident occurred on October 14, 2002.[24]  Plaintiff filed a Motion to Amend Complaint on September 10, 2004, which was more than one month before the statute of limitations deadline, but the court did not *grant* the Motion until October 19, 2004, which was five days after the statute of limitations had expired.  Defendants argue that because the Motion to Amend was not granted until after the statute of limitations had passed, the added Defendants (Officers Salyers, Martin, Brandeberry, Forbes, Adkins, and Grebb) must be dismissed, leaving only the originally named Defendants (the City of Whitehall and Officers Showalter, Snider, and Alan).[25]

To punish the Plaintiff for the court's heavy docket would be an inequitable and nonsensical result:

> As a party has no control over when a court renders its decision regarding the proposed amended complaint, the submission of a motion for leave to amend,

---

[24]Plaintiffs' Complaint was initially filed on April 14, 2003.

[25]Defendants argue that *Black-Hosang v. Ohio Dep't of Pub. Safety*, No. 02-3152, 2004 WL 950066, at *4-*5 (6th Cir. Apr. 28, 2004), holds that an amended complaint is officially filed on the day that the Motion to Amend the Complaint is granted by the district court.  (Def. Mot. at 38).  The case, however, does not stand for this proposition. The court, in passing and without any discussion, stated, in the "facts" section, that a plaintiff filed her amended complaint on September 17, 2001.  Later in the opinion, the court notes that the claim was officially filed on October 19, 2001.  Both dates were well after the statute of limitations had expired. Moreover, the court explicitly states: "The sole question before this panel is whether the amended complaint related back to the original complaint under Rule 15(c)."  *Id*. at *1.

properly accompanied by the proposed amended complaint that provides notice of the substance of those amendments, tolls the statute of limitations, even though technically the amended complaint will not be filed until the court rules on the motion.

*Moore v. State of Ind.*, 999 F.2d 1125, 1131 (7th Cir. 1993).

The Court concludes that Plaintiffs' submission of its Motion for Leave to Amend, which was filed prior to the expiration of the statute of limitations and to which a proposed amended complaint was attached, tolled the statute of limitations. The fact that the motion to amend was not granted until after the statute of limitations had expired does not preclude the amended claims. [26]  Thus, Defendants' contention is meritless.

## V.  CONCLUSION

Defendants' Motion for Summary Judgment with regard to Plaintiffs' claims pursuant to 42 U.S.C. § 1986 and Plaintiffs' municipal liability claims is **GRANTED**.  Similarly, the Court finds that Brian Bing's wrongful death claims cannot stand in light of Ohio Revised Code

---

[26]The parties also argue extensively about whether the Amended Complaint properly relates back to the initial complaint pursuant to Federal Rule of Civil Procedure 15(a).  The Court need not reach this matter in light of its findings regarding the statute of limitations.

§ 2125.02(A)(1).  Defendants' Motion for Summary Judgment with regard to Plaintiffs'

remaining claims is **DENIED**.

**IT IS SO ORDERED.**


                                                    **s/Algenon L. Marbley**

                                            **ALGENON L. MARBLEY**

                                        **United States District Court Judge**

**DATED:  June 22, 2005**